(April 18, 1995)

■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JOSE CARRACEDO, Appellant. [624 .NYS2d 601] —Appeal from judgment, Supreme Court, Bronx County (Frank Torres, J., at suppression hearing; Gerald Sheindlin, J., at jury trial and sentence), rendered August 10, 1990, convicting defendant of murder in the second degree, held in abeyance, and the matter remanded to the Supreme Court for a de novo combined *Wade/Mapp/Huntley* hearing.

The hearing court's order banning consultation between defendant and his counsel during an overnight recess in the suppression hearing, a period when an accused would normally confer with counsel, was in violation of defendant's Sixth Amendment right to counsel *(Geders v United States,* 425 US 80; *see, People v Enrique,* 165 AD2d 13, *affd* 80 NY2d 869). We note that there is no distinction between a defendant's right to counsel at trial and at a pretrial suppression hearing, as a defendant is entitled to have a pretrial suppression hearing conducted "with full respect for his right to counsel" *(People v Hodge,* 53 NY2d 313, 320). We also agree with the dissent that the error does not withstand harmless error analysis. We disagree with the dissent however in its view that the remedy is a remand for a new trial. The suppression hearing was a discrete proceeding and the remand that we order for a suppression hearing de novo fully addresses any constitutional deprivation defendant may have suffered at the hearing by virtue of the limitation imposed on his right to consult with counsel.

We hold the appeal in abeyance pending the determination of the suppression motion after a new hearing. Concur—Sullivan, Wallach and Nardelli JJ.

Murphy, P. J., and Tom, J., dissent in a memorandum by Tom, J., as follows: Defendant appeals his conviction of murder in the second degree on the grounds that his right to assistance of counsel was violated when the hearing court directed defendant not to consult with his attorney during an overnight recess of a pretrial suppression hearing while defendant was undergoing cross-examination.

On July 15, 1987, a duly convened Grand Jury in Bronx County charged defendant with murder in the second degree, manslaughter in the first degree and criminal possession of a weapon in the fourth degree pursuant to Indictment Number 4253/87. Only the murder and manslaughter counts were

submitted to the jury. Defendant's first trial ended in a mistrial on April 22, 1990 due to a deadlocked jury and the People immediately announced their readiness to proceed to a second trial. Defendant was subsequently convicted of murder in the second degree (Penal Law § 125.25 [1]) and was sentenced to an indeterminate term of imprisonment of from 25 years to life.

Testimony educed at the second trial reveals that the murder victim, 19-year-old Ursalina Santiago, arrived at the apartment she shared with her family and her friend, Frances Millet, at approximately 9:00 P.M. on June 28, 1987. Approximately 1/2-hour later, defendant, an acquaintance, telephoned Ms. Santiago and, during the course of the ensuing conversation which was monitored by Ms. Millet, defendant asked Ms. Santiago to come out and meet him, which advance was initially rebuffed.

Later in the conversation, defendant offered to smoke a "joint" with Ms. Santiago and also stated he would give her cocaine. Ms. Santiago subsequently left the apartment, after searching for a pack of cigarette rolling paper, under the pretext that she was returning a set of keys to her brother's friend.

At approximately 6:00 P.M. on June 29, 1987, a man walking his dog in Mosholu Park (the "Park") discovered Ms. Santiago's body and called the police. New York City Police Officer Roman Podolak arrived at and secured the crime scene at approximately 6:30 P.M. Officer Podolak found the victim lying under a bush in moist dirt, clothed in white shorts and a yellow top. Among the items recovered at the scene were a "Ninja" penknife, Bambu cigarette rolling paper and a lipstick case. Officer Podolak testified that the penknife had a brownish colored stain at the base of its blade which he believed to be blood.

Officer Podolak also observed a puncture wound near the left breast, and black and blue marks on the victim's neck. Crime-scene unit Detective Jack Cipolla testified that the body had ligature marks around the neck, a stab wound in her left breast, the clothing was in disarray and the left sneaker had been removed and a shoe lace lay under her neck.

Ms. Denise Bay, a neighborhood resident, testified that she and her common-law husband, Timothy Cottiers, were walking their dog in the vicinity of the botanical gardens between 11:00 P.M. and 11:30 P.M. on June 28th when they heard a young couple arguing in the Park. As Ms. Bay descended the

stairs into the Park, she saw a young woman walking away from a young man, whom she identified as defendant and whom she knew from the neighborhood, following her. As defendant caught up with the young woman, he placed his hand on her shoulder, which she angrily shrugged off. Mr. Cottiers also asserted that defendant, whom he recognized from the neighborhood, was the man in the Park.

At approximately 12:15 A.M. on June 29th, Victor Cruz, who knew both defendant and the victim from the neighborhood, was looking out his fourth floor bedroom window when he saw defendant running up Decatur Avenue and turning right onto Bedford Park Boulevard. Mr. Cruz testified that despite being on the fourth floor of the building, he could clearly see, with the aid of five bright street lamps, building lights and illumination from a nearby Pizza Parlor, that appellant was perspiring, his shirt looked muddy, and his hair was messy.

In furtherance of the police investigation, defendant underwent a 20-minute interview at the local police precinct on June 29, 1987 at approximately 8:00 P.M. At that time, and at an interview conducted a short time later, defendant told the police that: he was with the victim the previous night; he left her at Webster Avenue and went to a nearby Pizza Parlor alone; and he then returned home at 12:30 A.M. Defendant described a fairly fresh scratch on his neck as having been received in connection with his work as a sheetrock installer. Defendant also noted that he owned a "Ninja" penknife which he gave to Ms. Santiago because she admired it.

Cathy Alessandro, a part owner and the manager of the Pizza Parlor that defendant allegedly visited on the night Ms. Santiago was killed, testified at the first trial that she had worked from 12 Noon to 4:00 A.M. that day, that she knew defendant from the neighborhood and that to her knowledge, defendant did not come into the store to order pizza and a soda at the time in question. On cross-examination, Ms. Alessandro did admit that business was brisk, that she was bussing tables and helping in the kitchen and that she had used the restroom during her shift.

Ms. Alessandro was unable to testify at the second trial because she had gone on a four-month trip to Yugoslavia with her husband and child. Ms. Alessandro's prior testimony was admitted at the second trial, however, after a hearing was conducted pursuant to CPL 670.20.

New York State Trooper Jerry O'Hearn, an expert bloodhound trainer and handler, testified that a bloodhound named

Sasha he had trained over a five-year period picked up defendant's scent (from his sneakers) and tracked it to the spot where the victim's body was found, and again out of the Park.

Defendant was subsequently convicted, after the second jury trial, of murder in the second degree (Penal Law § 125.25 [1]) and was sentenced to a prison term as noted previously. Defendant now appeals.

Prior to trial, a combined *Huntley/Mapp/Wade* hearing was conducted before Justice Frank Torres from May 3, 1989 to May 18, 1989. Defendant took the stand during the *Mapp* portion of the hearing and, during cross-examination by the prosecutor, the court directed an overnight recess and instructed defendant as follows: "All right, Mr. Carracedo, you are still under oath. You will come back on the stand tomorrow. Do not talk to anyone about this case, including your lawyer."

Defendant's attorney took immediate exception and, the following morning, reported to the Judge that he had abided by the Judge's instructions and had not spoken to the defendant. Counsel again, on the record, protested that his inability to speak to his client during the overnight recess violated defendant's Sixth Amendment rights. I agree and would hold that the judgment of conviction should be reversed and a new trial ordered.

The right to assistance of counsel is a basic right which is deeply ingrained in our criminal justice system and represents the most effective means to avoid any appearance of overbearing upon the accused by the State *(see, People v Cunningham,* 49 NY2d 203, 207; *People v Harris,* 77 NY2d 434, 439; *People v Settles,* 46 NY2d 154, 160). The defendant's right to assistance of counsel is guaranteed by both the Federal (US Const 6th, 14th Amends) and State (NY Const, art I, § 6) Constitutions.

In *People v Cunningham (supra,* at 207), the Court of Appeals instructed that the courts of this State are to "exercise[ ] the highest degree of vigilance in safeguarding the right of an accused to have the assistance of an attorney *at every stage of the legal proceedings against him"* (emphasis added; *see also, People v West,* 81 NY2d 370, 373; *People v Harris, supra,* at 439; *People v Ross,* 67 NY2d 321, 324; *People v Blake,* 35 NY2d 331).

Contrary to the People's somewhat enigmatic argument that a defendant's right to counsel at a pretrial hearing is less significant than his right to counsel at trial, a preliminary hearing: "conceptually and pragmatically may serve as a

virtual minitrial of the prima facie case (see Amsterdam, Segal & Miller, Trial Manual for the Defense of Criminal Cases [3d ed, 1974], § 139 *et seq.).* In its presentation, the identity of witnesses, to greater or lesser degree, testimonial details and exhibits, perforce will be disclosed. * * * It has been suggested that 'in practice [it] may provide the defense with the most valuable discovery technique available to him'." *(People v Hodge,* 53 NY2d 313, 318, quoting *United States ex rel. Wheeler v Flood,* 269 F Supp 194, 198.)

It has also been held that suppression hearings may determine the outcome of the prosecution and, therefore, representation by counsel may very well be as essential as during the trial itself *(United States v Wade,* 388 US 218, 225; *United States v Clarke,* 475 F2d 240, 245). It is clear from the foregoing that a suppression hearing is a critical stage of the criminal prosecution process and, since defendant is to be afforded the constitutional guarantee of " 'the guiding hand of counsel at every step in the proceedings against him' " *(Coleman v Alabama,* 399 US 1, 7 quoting *Powell v Alabama,* 287 US 45, 69; *People v Hodge, supra,* at 318; *People v Jones,* 145 AD2d 648, 649; *People v Speller,* 133 AD2d 865), the fundamental right to counsel must attach with equal force at a suppression hearing as at trial.

The People, relying on, *inter alia, People v Enrique* (165 AD2d 13, *affd* 80 NY2d 869), assert that it was within the trial court's discretion to bar defendant from consulting with his attorney. *Enrique,* however, is readily distinguishable as the defendant in that case was prohibited from speaking to his attorney during a brief luncheon recess whereas in the matter before us, the ban on consultation occurred during an overnight recess. The critical factor in determining whether a violation of the defendant's right to counsel occurred is the length of time to which access to counsel was denied *(People v Joseph,* 84 NY2d 995).

The United States Supreme Court, in *Geders v United States* (425 US 80, 88), stated that: "It is common practice during [overnight] recesses for an accused and counsel to discuss the events of the day's trial. Such recesses are often times of intensive work, with tactical decisions to be made and strategies to be reviewed. The lawyer may need to obtain from his client information made relevant by the day's testimony, or he may need to pursue inquiry along lines not fully explored earlier. At the very least, the overnight recess during trial gives the defendant a chance to discuss with counsel the significance of the day's events. Our cases recognize that the

role of counsel is important precisely because ordinarily a defendant is ill-equipped to understand and deal with the trial process without a lawyer's guidance." *(See also, People v Joseph, supra; People v Blount,* 159 AD2d 579, *affd* 77 NY2d 888.)

In *Perry v Leeke* (488 US 272, 284), the United States Supreme Court, citing *Geders,* re-emphasized that forbidding consultation between a defendant and his/her attorney during an overnight recess is impermissible, stating: "[T]he normal consultation between attorney and client that occurs during an overnight recess would encompass matters that go beyond the content of the defendant's own testimony—matters * * * such as the availability of other witnesses, trial tactics, or even the possibility of negotiating a plea bargain. It is the defendant's right to unrestricted access to his lawyer for advice on a variety of trial-related matters that is controlling in the context of a long recess. * * * The fact that such discussions will inevitably include some consideration of the defendant's ongoing testimony does not compromise that basic right."

In view of the foregoing, I agree with the majority's conclusion that the defendant's constitutionally guaranteed right to counsel was violated by the trial court's ban on attorney-client consultation during the overnight recess. I differ with the majority, however, upon the issue of the magnitude of the trial court's error and the appropriate sanction which is warranted.

The People urge, and the majority apparently agree, that a harmless error analysis is applicable to the trial court's error and, therefore, have concluded that only a de novo suppression hearing is warranted. In the first instance, I believe the majority's holding, contrary to the aforecited case law, has placed a different standard upon the right to the assistance of counsel at a pretrial hearing than at the trial itself.

In *Perry v Leeke (supra,* at 280), the United States Supreme Court held that the denial of the fundamental right of access to counsel is not subject to a prejudice analysis of the kind that is appropriate in determining whether the quality of the lawyer's performance itself was constitutionally defective, as "a showing of prejudice is not an essential component of a violation of the rule announced in *Geders" (supra,* at 278-279; *see also, Penson v Ohio,* 488 US 75, 88).

In *People v Felder* (47 NY2d 287, 295), the Court of Appeals held that: "Harmless error analysis is not, however, available

in all instances of constitutional error. There are some errors which operate 'to deny [an] individual defendant his fundamental right to a fair trial [in which event], the reviewing court must reverse the conviction and grant a new trial, *quite without regard to any evaluation as to whether the errors contributed to the defendant's conviction.'* " (Quoting *People v Crimmins,* 36 NY2d 230, 238 [emphasis added].)

Further, the Court of Appeals holding in *People v Wicks* (76 NY2d 128) is not to the contrary. In *Wicks,* the Court applied a harmless error analysis for the failure to provide counsel to an individual at a *preindictment hearing.* The Court went on to hold that: "While *harmless error analysis is inapplicable to alleged errors depriving a defendant of effective assistance of counsel at his trial or generally during the course of his prosecution,* we conclude that in the limited circumstances of a preliminary hearing intended only to determine whether a defendant may be held over for action by the Grand Jury, harmless error analysis is applicable." *(Supra,* at 130-131 [emphasis added].)

Since, in the matter at bar, defendant was denied counsel for an extended period of time at a postindictment, pretrial suppression hearing which clearly occurred during the course of his prosecution and where adequate representation by counsel may be as essential to proper defense as during the trial itself *(Powell v Alabama,* 287 US 45, *supra),* I can only conclude that the trial court's error is of sufficient magnitude to mandate the reversal of defendant's conviction and to remand the matter for a new trial, which should be preceded by a new suppression hearing.